## S07A0928. CARR v. THE STATE.
(653 SE2d 472)

HINES, Justice.

Lashundra Shenae Carr appeals her convictions for malice murder, kidnapping with bodily injury, and concealing the death of another, all in connection with the death of Kareem Cowan. For the reasons that follow, we affirm.[1]

Construed to support the verdicts, the evidence showed that Carr lived with her mother and her brothers Desmond Carr ("Desmond") and Unree Carr ("Unree"). Cowan lived a few houses away from Carr.

---

[1] Cowan was killed on August 17, 2003. On October 27, 2003, a DeKalb County grand jury indicted Carr, together with Desmond Carr, Unree Carr, Brittany Crumbley, Thomas Geter, Lindsey Humphrey, Robert Carlos Jackson, and Joseph Alexander Rayford, for malice murder, felony murder while in the commission of aggravated assault, felony murder while in the commission of kidnapping, aggravated assault, and kidnapping with bodily injury; all but Geter were also indicted for concealing the death of another. Carr was tried alone before a jury July 12-15, 2004, and found guilty of all charges. On July 21, 2004, the trial court sentenced Carr to a term of life in prison for malice murder, a concurrent term of life in prison for kidnapping with bodily injury, and a concurrent term of ten years in prison for concealing the death of another; the felony murder charges stood vacated by operation of law, and the aggravated assault charge merged with the malice murder. See *Malcolm v. State*, 263 Ga. 369, 372-374 (4), (5) (434 SE2d 479) (1993). Carr moved for a new trial on July 28, 2004, amended the motion on May 4, 2005, and again on May 5, 2005; the motion as amended was denied on May 9, 2005. On June 9, 2005, Carr filed a notice of appeal; on April 25, 2006, this Court dismissed the appeal as the notice of appeal was untimely. (*Carr v. State*, Case No. S06A1235.) On April 28, 2006, Carr filed a purported "out of time notice of appeal"; the ensuing appeal was dismissed by this Court in an opinion dated October 2, 2006. *Carr v. State*, 281 Ga. 43 (635 SE2d 767) (2006). On October 17, 2006, Carr filed in the trial court a request for an out-of-time appeal, which was granted on November 28, 2006. Carr filed her notice of appeal on December 21, 2006, her appeal was docketed in this Court on March 12, 2007, and submitted for decision on May 7, 2007.

Joseph Rayford, the father of two of Carr's children, invited Darius White, Thomas Geter, and Lindsey Humphrey to Carr's home. They arrived to find Carr, Desmond, Unree, Brittany Crumbley, Robert Jackson, and others outside talking about Cowan. There was animosity between Cowan and the others, based upon Cowan's unwillingness to share Crumbley sexually with others. Desmond had stolen Cowan's car a few days earlier, and Crumbley told the assembled group that Cowan was going to retaliate by killing Carr's children.

Carr asked Humphrey to go to Cowan's home to get him outside, and she told Crumbley to lure Cowan outside his house. Humphrey, with Rayford, Desmond, and Crumbley, went to Cowan's home. Crumbley, who was then 14 years of age, lured Cowan outside the house by promising him sexual favors. Humphrey placed Cowan in a headlock, and began beating him; the other men also beat Cowan and brought him up the street to Carr's home. Most of the group began beating Cowan with their hands and fists. Cowan was also hit in the face with a stick and whipped with a belt. Cowan was unable to fight back and begged the group to stop hitting him. After a brief respite, the group resumed beating and kicking Cowan. Carr did not strike Cowan; she stated that she wished she had to urinate, so that she could do it on Cowan. Humphrey did urinate on him.

The group removed Cowan's clothes, poured gasoline on him, and lit it. Several people wrapped him in a sheet and put him in the back of a pickup truck. Some of the group got into the pickup truck with Cowan. Carr told Jackson, who was to drive the pickup truck, to stay off a certain busy street so as to avoid police. Jackson drove off, and Carr followed closely, driving a Ford Explorer. Jackson's chosen destination was a school ground, but other people were there; Carr and Jackson discussed where to take Cowan, and another school property was chosen. Cowan attempted to get up; Carr leaned out of a window of the Explorer and told Unree to hit Cowan, but he did not do so; she then told Rayford to exit the Explorer and to hit Cowan and make him stay down. Rayford did so. After arriving at the chosen school, Desmond, Rayford, and Unree threw the naked Cowan into the surrounding woods. Cowan died of multiple blunt force injuries; there were chemical burns on the left side of his body.

Several days later, television news programs reported that Cowan's body had been found. Carr summoned those involved in the beating, and those who had witnessed it, to a meeting at her home; Carr went to find Crumbley to ensure that she attend the meeting. At the meeting, Carr said that anyone who talked about the beating would suffer the same fate as Cowan. Carr, however, bragged to a cousin about the beating, and said she was glad it had been done.

1. Although Carr notes that there was no evidence that she struck Cowan during the killing, the trial court instructed the jury on

the law of party to a crime. The evidence was sufficient to enable a rational trier of fact to find Carr guilty beyond a reasonable doubt of the crimes of which she was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. The trial court allowed the State to present evidence of similar transactions by Carr. See *Williams v. State*, 261 Ga. 640 (409 SE2d 649) (1991). Kimbro, a neighbor of Carr, testified that within the two months prior to Cowan's death: Kimbro had difficulties with Carr, and had called the police multiple times due to noise at her home; while Kimbro was working in his next-door-neighbor's yard, Carr and a group of a dozen family members and supporters, including Desmond and Unree, came to the home; they cursed Kimbro; he became fearful; he went to his automobile and retrieved a pistol; and the group left when they saw the pistol.

Both Mr. and Ms. Lenceroz, neighbors of Carr's, testified that in the eight months prior to Cowan's death: the Lencerozes feared for their daughter's safety from the Carr family; they went to a house where the Carr family and friends were assembled and told them to stop bothering their daughter; as they were walking back to their house, a pickup truck, and a Ford Explorer driven by Carr, "surrounded" them in the street; several people were in the vehicles, including Desmond, Unree, and another brother of Carr's; Carr exited the Ford Explorer and demanded the Lencerozes produce their "bitch ass daughter"; Carr told her brothers "go get my shotgun," "go get my Uzi," and "go get Joseph," meaning Rayford; the Lencerozes' daughter came out of their house; Carr began to choke the daughter, and a fight ensued. The Lencerozes also testified that: on another occasion, they were at the house of another neighbor while the neighbor worked on their car; Carr drove back and forth in the Ford Explorer; Carr, with family and friends, came back in two vehicles; Rayford emerged from one and said that he understood the Lencerozes had threatened his and Carr's children; Carr was cursing; one of Carr's group went to one of the vehicles as though to retrieve a weapon; and the neighbor who was working on the Lencerozes' automobile stopped the confrontation.

The trial court instructed the jury that the similar transaction evidence "may be considered for the limited purpose of showing, if it does, the state of mind, knowledge, or intent of the defendant in the crimes charged in the case now on trial." Carr argues that the prior incidents had no logical connection to the charged crimes, and were not sufficiently similar to the charged crimes to warrant a similar transactions instruction. "An appellate court will not disturb the findings of the trial court on the issue of similarity or connection of similar transaction evidence unless they are clearly erroneous." *Biggs v. State*, 281 Ga. 627, 629 (2) (642 SE2d 74) (2007). And, the

proper focus is on the similarity of the prior incidents to the crimes charged, not their differences. *Hinton v. State*, 280 Ga. 811, 818 (6) (631 SE2d 365) (2006). The similar transaction evidence presented was probative of the fact that Carr, when holding animosity toward her neighbors, would, through a group of friends and family, which included those involved in the crimes charged, take part in a confrontation, which included intimidation, threats of violence, and actual violence. There was no error in admitting the evidence. See *Zellars v. State*, 278 Ga. 481, 483 (4) (604 SE2d 147) (2004).

3. Carr contends that her character was impermissibly placed in evidence and that her motion for a mistrial should have been granted. On direct examination, the State asked a police officer who interrogated Carr four days after the murder to describe her manner in the interview. The officer replied: "[w]ell, when talking to someone who has been around a little while, so to speak, meaning educated or familiar with the system . . .." At this point, Carr interposed an objection, the jury was excused, and Carr moved for a mistrial on the ground that the State had injected her character into the trial, as the officer's answer implied she had previous "run-ins with the law." The court denied the motion, stating that the description "educated or familiar with the system" was not a comment on Carr's character.[2] When the jury returned, the State asked: "[d]escribe how — what information you got from her that you didn't already know." The witness testified that Carr "did not offer any information that we didn't know. She answered questions that she knew that we knew about; but outside of that, she did not offer any other knowledge that we believe she had."[3]

"Whether to grant a motion for mistrial is within the trial court's sound discretion, and the trial court's exercise of that discretion will not be disturbed on appeal unless a mistrial is essential to preserve the defendant's right to a fair trial." *Ottis v. State*, 271 Ga. 200, 201 (3) (517 SE2d 525) (1999). Nothing in the officer's testimony indicated to the jury that Carr had ever been convicted of a crime, or that she had even been a suspect in one. See *Holmes v. State*, 272 Ga. 517, 518 (3) (529 SE2d 879) (2000); *Guess v. State*, 264 Ga. 335, 337 (4) (443 SE2d 477) (1994). Further, even if the testimony is considered to refer to Carr's character, "[a] nonresponsive answer that impacts negatively

---

[2] After the court overruled the motion for a mistrial, the court granted Carr's request that her objection be considered to be continuing. The State then declared it "wouldn't mind moving to strike that . . ."; Carr stated "[y]ou don't have to strike it, let's forget it."

[3] In Carr's first statement to the police, she implicated others in the beating, but did not report driving the Ford Explorer. After certain details of the statements of others were revealed to her, she amended her statement to include certain information she claimed had been told her by others.

on a defendant's character does not improperly place the defendant's character in issue." *Hansley v. State*, 267 Ga. 48, 49 (3) (472 SE2d 305) (1996). See also *Williams v. State*, 269 Ga. 827, 829 (5) (504 SE2d 441) (1998). There was no request that the trial court instruct the jury to disregard the unresponsive answer, see *Mitchell v. State*, 275 Ga. 42, 44 (3) (561 SE2d 803) (2002), and the trial court did not abuse its discretion in denying the motion for a mistrial. *Holmes*, supra.

4. After the jury began deliberating, the jury foreman advised the court that a juror stated that he had prepared a tax return for Carr's sister. The court questioned the juror, excused him from service, and placed an alternate juror on the jury. The court noted that, although the dismissed juror said he did not at first recognize the relationship between Carr and her sister, during voir dire the jurors were told to notify the court if an answer given during voir dire was later discovered to be incorrect, and that the juror had not done so.[4]

Under OCGA § 15-12-172,[5] upon "good cause shown to the court," a trial court may replace a juror with an alternate.

> The trial court must exercise its discretion in removing a juror, and it may [effect] such a removal even after deliberations have begun. There must be some sound basis upon which the trial judge exercises his discretion to remove the juror. A sound basis may be one which serves the legally relevant purpose of preserving public respect for the integrity of the judicial process.

(Citations and punctuation omitted.) *State v. Arnold*, 280 Ga. 487, 489 (629 SE2d 807) (2006). Here, the court was authorized to find that, at the very least, the juror did not promptly inform the court when it became clear that his voir dire representation that he did not know any of Carr's relatives was incorrect. There was no abuse of discretion. See *Wooten v. State*, 250 Ga. App. 686, 687 (3) (552 SE2d 878) (2001).

*Judgments affirmed. All the Justices concur.*

---

[4] The juror stated that he had noticed Carr's sister on the first day of trial.

[5] OCGA § 15-12-172 reads:

If at any time, whether before or after final submission of the case to the jury, a juror dies, becomes ill, upon other good cause shown to the court is found to be unable to perform his duty, or is discharged for other legal cause, the first alternate juror shall take the place of the first juror becoming incapacitated. Further replacements shall be made in similar numerical sequence provided the alternate jurors have not been discharged. An alternate juror taking the place of any incapacitated juror shall thereafter be deemed to be a member of the jury of 12 and shall have full power to take part in the deliberations of the jury and the finding of the verdict. Any verdict found by any jury having thereon alternate jurors shall have the same force, effect, and validity as if found by the original jury of 12.

Decided November 21, 2007.

*Franklin & Hubbard, Curtis L. Hubbard, Jr., Rodney A. Williams*, for appellant.

*Gwendolyn Keyes Fleming, District Attorney, Barbara B. Conroy, Assistant District Attorney, Thurbert E. Baker, Attorney General, Robin J. Leigh, Assistant Attorney General*, for appellee.