706 S.E.2d 205 (2011)
RAYNER
v.
The STATE.
No. A10A2356.
Court of Appeals of Georgia.
February 15, 2011.
*207 Billy L. Spruell, Marietta, for appellant.
Penny Alane Penn, District Attorney, Sandra A. Partridge, Assistant District Attorney, for appellee.
MIKELL, Judge.
After a jury trial, Richard Allen Rayner was convicted of child molestation, criminal attempt to commit rape, and false imprisonment and sentenced to ten years to serve and ten years on probation. On appeal, Rayner asserts several enumerations of error. He argues that the trial court erred when it conveyed its opinion to the jury and charged the jury incorrectly about the law regarding prior difficulties between the parties. Rayner also contends that the trial court impermissibly restricted his expert witness's testimony and his cross-examination of the victim and other witnesses. Finding no error, we affirm.
On appeal from a criminal conviction, the evidence must be viewed in the light most favorable to the verdict, and the defendant no longer enjoys the presumption of innocence; moreover, an appellate court does not weigh the evidence or determine witness credibility but only determines whether the evidence is sufficient under the standard of Jackson v. Virginia.[1] Conflicts in the testimony of the witnesses, including the State's witnesses, are a matter of credibility for the jury to resolve. As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld. The testimony of a single witness is generally sufficient to establish a fact.[2]
So viewed, the evidence shows that fourteen-year-old C.P. testified that when she was nine years old, she told her mother that Rayner, her uncle,[3] had been touching her in inappropriate places for approximately a year. C.P. explained that she and her cousin, Aaron, Rayner's son, were very close and that she often visited their home. C.P. testified that when Aaron was not around, Rayner would lure her into bedrooms and touch her breasts and vagina with his hand, tongue, and penis.
When asked about specific encounters, C.P. testified that the first act occurred when Rayner touched her breast on the outside of her clothes while they were watching a movie in Aaron's bedroom. She left the room and when she returned, Rayner had left. On another occasion, Rayner took her into another room, raised her shirt and licked her breasts, and told her not to tell anyone. C.P. testified that she told Rayner to stop but he did not; that the encounter lasted for approximately 30 seconds; and that she used a towel to wipe herself off afterward. C.P. recalled four or five encounters were Rayner touched her vagina on the outside and inside of her underwear. On two other occasions, C.P. recalled that Rayner picked her up and took her to a bedroom, and locked the door and had her sit on the bed. He then pulled her clothes down and his penis out and touched her vagina with his penis while straddling her with his legs and holding her arms down. C.P. testified that the touching only occurred when she was at the Rayner home alone with Rayner and Aaron and that she thought that if she told, Rayner would do something to her.
C.P. recalled that on the day that she told her mother about the encounters with Rayner, she had been in the weight room of Rayner's home with Aaron. Aaron left the room, and Rayner picked her up and put her back down and then went upstairs. C.P. testified that she began to cry and asked to talk to her mom, Charlene Pruitt, and then told her what had been happening. C.P. and Charlene left the Rayner home immediately. C.P. testified that soon thereafter, she and her mother met with the family at her grandmother's house, that Rayner denied touching C.P., and that C.P. affirmed that he had. *208 One of her mother's sisters, Stephanie, asked C.P. if her mother's boyfriend had been touching her, and she replied that he had not. C.P. recalled that her mother and aunt Jenni were both crying, and she felt like they all believed Rayner. C.P. testified that she never wavered in her story although she knew that recanting would have made her mom and her aunt happy.
Charlene testified that she, her mom, and her two sisters, Stephanie and Jenni, were very close and were frequently together on the weekends and vacationed together. Additionally, she often left C.P. with Rayner and Aaron at their home when she went out with her sisters. Charlene further testified that C.P. loved Rayner like a father; that no argument or problem with Rayner preceded C.P.'s outcry of abuse; that on the day that C.P. talked to her,[4] she had gone downstairs to chastise her for listening to inappropriate music and reprimanded her for "dirty dancing"; that C.P. replied, "[w]hy is [sic] that I always get in trouble, and he never does," referring to Rayner; and that she asked C.P. what she meant and C.P. said, "[b]ecause he touches me"; and that when she continued to question C.P., she told her that Rayner made her do handstands and would touch her private area and that he had touched his private part to her vagina. Charlene recalled that she left the Rayner home immediately and that she and C.P. discussed the abuse over the next couple of days and that C.P. would cry each time.
Charlene testified that she met with her family about the incident and that no one was in support of her going to the police, including C.P. On cross-examination, Charlene testified that she did not take C.P. to the doctor because C.P. told her that Rayner had not penetrated her. Charlene also acknowledged that the family had vacationed together at a beach house two months after C.P.'s outcry, although C.P. was never left alone with Rayner.
Randall Calvin Pruitt, C.P.'s father, testified that he heard about the incident from a friend, then questioned C.P., who told him that Rayner touched her private parts. Randall called Charlene, and they reported the incident to the police. Detective Thomas Moore of the Forsyth County Sheriff's Office testified that Charlene reported the incident to the police in November 2005, which was more than a year after its occurrence; that he set up an interview for C.P. at a children's advocacy center; and that he heard the details of the allegations as C.P. was being interviewed. Rayner testified and denied that he had ever had any sexual contact with C.P. but he acknowledged that there were times when he was alone with her.
1. In his first two enumerations of error, Rayner argues that the trial court conveyed its opinion to the jury when it charged the law regarding prior difficulties between the parties.
The trial court charged as follows:
Evidence of prior difficulties between the defendant and the alleged victim has been admitted for the sole purpose of illustrating, if it does so illustrate, the state of feeling between the defendant and the alleged victim and the bent of mind and course of conduct on the part of the defendant.[5] Whether this evidence illustrates such matters is a matter solely for you, the jury, to determine, but you are not to consider such evidence for any other purpose.
Rayner argues that the charge intimates an opinion that there was indeed evidence of prior difficulties, when there was none, and that it telegraphed to the jury that the court agreed with the state's theory of the case. The state responds that each instance of molestation reported by C.P., although not necessarily charged by the state, constituted evidence of prior difficulties justifying the charge. We agree.
"[P]roof of prior difficulties between the defendant and victim  including prior acts of molestation  is admissible without *209 notice or a hearing."[6] This evidence is admissible to show the defendant's "motive, intent, and bent of mind in committing the act against the victim which resulted in the charges for which he was being prosecuted."[7] The evidence here supported the trial court's charge. Rayner was charged with child molestation for placing his penis on or about C.P.'s vagina, with criminal attempt to commit rape for doing the same while holding C.P. down, and with false imprisonment for illegally detaining her. But C.P. also testified to various other instances of Rayner touching her breasts and vagina, all of which constitute evidence of prior difficulties. Thus, by giving the charge, the trial court was not commenting on the evidence nor was the charge unsupported by the evidence. Therefore, these enumerated errors fail.
2. Rayner argues that the trial court improperly restricted his expert's testimony. In support of his argument, Rayner refers us to several excerpts from the expert's testimony but does not clearly set forth the alleged error. In one instance, while discussing the efficacy of multiple interviews, the expert testified that research shows that interviewing children multiple times risks the possibility of contaminating the information received in subsequent interviews. He then stated: "And Dr. Stephen Ceci out of Chicago has shown clearly that after a thirty-day period of time, in an experiment he conducted, experts cannot tell anything about what really did or did not happen based upon the interviews." The state objected on the grounds that the expert was testifying about the witness's believability, and the trial court sustained the objection. Experts are allowed to discuss the propriety and effect of interviewing techniques in child sexual abuse cases,[8] and the record here shows that Rayner's expert was permitted to testify at length on this topic. It is also true, however, that an expert witness cannot testify as to his opinion of a victim's truthfulness.[9] Accordingly, we find no error in the trial court's ruling.
In the course of discussing scientific and forensic interviews, the expert states that in "[t]herapy, you assume it's true because somebody says it. In a forensic interview, first you say it, then you prove it. We have to get something that the trier of fact, in this case the jury, can have some scientific belief in." The state objected, and the trial court sustained the objection. Rayner has not pointed out how this ruling unfairly restricted his expert's testimony, who went on to provide his criticisms of how C.P.'s interview was conducted. When asked "would there be a problem with an interview where the witness . . . couldn't remember the first outcry, or claimed they couldn't remember[,]" the trial court sustained the state's objection that the witness needed to specify who he was talking about and then reprimanded Rayner to just talk about interviewing techniques. Rayner also has not stated specifically how this ruling constituted error. "Control of the cross-examination of a witness is to a great degree within the discretion of the trial court and will not be controlled unless abused."[10] Although Rayner argues generally that the trial court abused its discretion in limiting the expert's testimony, the record belies this contention.
3. In his fourth and fifth enumerations of error, Rayner contends that the trial court erred when it excluded evidence of prior false allegations of a sexual nature made by C.P. and did not allow her or her *210 mother to be cross-examined on the topic. We disagree.
Evidence of prior false allegations is indeed admissible to attack the witness's credibility and as substantive evidence in support of the argument that the charged offense did not occur.[11] However,
to protect the complaining witness from unfounded allegations that the witness has made similar false allegations in the past, before such evidence can be admitted, the trial court is required to make a threshold determination outside the jury's presence that a reasonable probability of falsity exists.[12]
In the instant case, the trial court held the required hearing and concluded that there had been no prior false allegation. We find no error.
The record shows that Rayner's counsel filed a motion to allow prior false allegations of sexual misconduct to be admitted into evidence.[13] At the hearing on the motion, C.P. was asked if she told her mother that she watched a pornographic movie with a former neighbor, Ashley Mankovitch, and she replied that she did not remember. C.P. was also asked if she told her mother that her neighbor touched her inappropriately, and she replied that she did not remember. C.P. did recall, however, that after a conversation with her mother, her mother talked to Ashley's parents. On cross-examination, C.P. testified that she had no memory of being sexually abused by Ashley.
Mankovitch's father testified that he had a conversation with Charlene, wherein she told him that C.P. said that Ashley made her watch porn and touched her. He did not recall anything else about the conversation as it had occurred at least four years before trial. Ashley Mankovitch testified that she had never watched a pornographic movie with or inappropriately touched C.P. Charlene testified that the girls were "dirty dancing" while watching television and that C.P. told her that she was uncomfortable and asked to come home; that she talked to Ashley's father and they both talked to the girls; and that there was no need to make a report to the police. The trial court, acting as the trier of fact, found Charlene's testimony to be credible and concluded that there had been no prior false allegation. Therefore, Rayner was not permitted to question the witnesses about the allegation. At trial, the state filed a motion in limine to exclude the evidence, which the trial court granted.
Rayner argues that the trial court erred when it did not permit him to cross-examine Charlene about the prior false allegation and cites Goldstein v. State[14] in support of his position. But Goldstein is inapposite here. In that case, there was evidence of several prior false allegations made by the victim, but there was no hearing as to the admissibility of the evidence because trial counsel failed to investigate the evidence, resulting in the trial court's finding of ineffective assistance of counsel.[15]
In the instant case, the trial court made the pre-trial determination that there was no false allegation of sexual misconduct. "[W]e accept the factual findings and credibility determinations made by the court at pre-trial hearings on the admissibility of evidence unless they are clearly erroneous[,]"[16] and we do not find them erroneous here. Assessing the credibility of the witnesses, the trial court found Charlene's testimony that she talked to Ashley's father because the girls were dancing inappropriately to be credible, and the trial court aptly determined that this was not an allegation of sexual *211 misconduct. We find no abuse of discretion in its determination.[17]
4. In his final enumeration of error, Rayner argues that the trial court erred when it did not allow him to cross-examine C.P.'s grandmother about Charlene's statements about her intent to report the incident or about the grandmother's thoughts and interactions with C.P. that caused her to question C.P.'s credibility. We agree with the state that Charlene's statements to the grandmother constituted inadmissible hearsay and that the grandmother could not testify to specific instances of bad conduct exhibited by C.P. Rayner has not cited specific authority for the admission of this evidence, arguing instead, generally, that it violated his right to cross-examination.
Although a defendant has the right to conduct a thorough and sifting cross-examination, the trial court is authorized to restrict cross-examination to matters that are material to the issues at trial.[18] Even if we assume, however, that Rayner should have been allowed to cross-examine the grandmother as he wished, Rayner has not shown that he was harmed. A successful enumeration of error requires both a showing of error and harm.[19] The gist of Rayner's argument appears to be that the inability to present this evidence was harmful because its admission would have caused the jury to question C.P.'s credibility. But had the jury wished to find that C.P. was not credible, there was ample evidence upon which it could have based that finding. C.P.'s grandmother explicitly testified that C.P. had a bad reputation and that she would not have believed anything C.P. said under oath. Additionally, C.P.'s aunt Stephanie testified that C.P. had a bad reputation for truthfulness in the family. Nonetheless, in the face of this evidence, as well as the delayed report to the police and the lack of physical evidence, the jury chose to believe C.P.'s version of the events, which it was authorized to do. "It was the jury's role to assess the credibility of the witnesses, resolve any conflicts in the evidence, and arrive at a determination of the facts."[20] And the testimony of the victim, alone, is sufficient to support the convictions.[21] "As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the state's case, an appellate court must uphold the jury's verdict."[22] Accordingly, as Rayner has not shown how he was harmed by the exclusion of the evidence he sought to introduce through further cross-examination of the grandmother, this enumeration of error also fails.
Judgment affirmed.
SMITH, P.J., and ADAMS, J., concur.
NOTES
[1] 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
[2] (Citation, punctuation, and footnote omitted.) Shorter v. State, 271 Ga.App. 528, 528-529(1), 610 S.E.2d 162 (2005).
[3] Rayner was married to C.P.'s mother's sister, Jenni.
[4] Charlene recalled that C.P. was ten years old when the outcry occurred.
[5] "[T]he Supreme Court has approved the pattern jury charge on this issue[.]" (Footnotes omitted.) Newsome v. State, 289 Ga.App. 590, 595(4), 657 S.E.2d 540 (2008).
[6] (Footnote omitted.) Stillwell v. State, 294 Ga. App. 805, 809(2)(e), 670 S.E.2d 452 (2008) (evidence that the victim had previously alleged that the defendant touched her, conduct not charged in the indictment, was admissible and did not require notice of the presentation of similar transaction evidence).
[7] (Citations and punctuation omitted.) Hammontree v. State, 283 Ga.App. 736, 739(2), 642 S.E.2d 412 (2007) (evidence of a prior difficulty that occurred one week before the act for which the defendant was charged was admissible).
[8] See Barlow v. State, 270 Ga. 54, 507 S.E.2d 416 (1998).
[9] See Roberson v. State, 214 Ga.App. 208, 210(4), 447 S.E.2d 640 (1994).
[10] (Citations and punctuation omitted.) Carpenter v. State, 167 Ga.App. 634, 640(6), 307 S.E.2d 19 (1983).
[11] Osborne v. State, 291 Ga.App. 711, 713(2), 662 S.E.2d 792 (2008).
[12] (Citation omitted.) Id.
[13] In the motion, Rayner asserted that C.P. had alleged that she had been molested by a neighbor, who was four years older than her, and by a teacher, who had looked down her blouse. Because the teacher was not available as a witness, the hearing proceeded in connection with the other allegation.
[14] 283 Ga.App. 1, 640 S.E.2d 599 (2006).
[15] Id. at 6(3)(a), 640 S.E.2d 599.
[16] (Footnote omitted.) Williams v. State, 257 Ga.App. 54, 55(1), 570 S.E.2d 362 (2002).
[17] See Banks v. State, 250 Ga.App. 728(1), 552 S.E.2d 903 (2001).
[18] Richardson v. State, 276 Ga. 639, 640(1), 581 S.E.2d 528 (2003).
[19] See Ashe v. State, 285 Ga. 359, 361(2), 676 S.E.2d 194 (2009).
[20] (Citation and punctuation omitted.) Wells v. State, 281 Ga. 253, 254(1), 637 S.E.2d 8 (2006).
[21] Barnes v. State, 299 Ga.App. 253, 254-255(1), 682 S.E.2d 359 (2009) (conviction of child molestation supported by victim's testimony, alone, despite lack of physical evidence). See also Davis v. State, 221 Ga.App. 131, 132(1), 470 S.E.2d 520 (1996) (where there were no physical findings to corroborate allegation of rape and evidence of guilt was not overwhelming, conviction was affirmed because victim's testimony, alone, was sufficient to prove defendant's guilt).
[22] (Punctuation and footnote omitted.) Barnes, supra at 255(1), 682 S.E.2d 359.