## A07A0427. KRIRAT v. THE STATE.
(649 SE2d 786)

ADAMS, Judge.

Vichien Krirat appeals following his conviction on four counts of child molestation. In the same trial, Krirat was acquitted on three counts of statutory rape.

Some time before the summer of 2003, Krirat met 14-year-old Ka. H. and three 13-year old girls, Kr. H., B. P. and E. W., through his son who attended school with the girls. Krirat was 36-37 years old at

---

the time. The girls often came to Krirat's house, where they would listen to music, play video games, watch movies, make bonfires and ride four-wheelers. Ka. H. testified that during the latter part of 2002, her relationship with Krirat became sexual. They would kiss and sometimes Krirat would touch her breasts and vagina. This relationship came to a stop when Ka. H. was 15 and she discovered that Krirat was having relations with the other girls, including her younger sister Kr. H. Ka. H. made a deal with Kr. H. that if she stopped having sex with Krirat, Ka. H. would not tell their mother what had happened. But in August 2003 when Ka. H. believed that Kr. H. had failed to keep that promise, she reported Krirat's behavior to their mother. The mother then reported the matter to police, and all four girls went to the police station together, along with their parents.

Deputy Pat Lundy, an investigator with the Peach County Sheriff's office, met with the girls and their parents. After discussing the matter with all four girls in a group, she asked each girl to make a written statement regarding her relationship with Krirat. At the trial, Deputy Lundy read the statements of Kr. H., B. P. and E. W. to the jury. B. P. wrote that she would drink alcohol with Krirat. When Krirat got drunk, he would rub B. P.'s chest and legs, grab her buttocks and try to kiss her. She stated that she had sex with Krirat in the middle of June 2003, after she had two coconut drinks with alcohol, a beer and another drink she could not remember. She stated that Krirat told her not to tell what had happened between them.

E. W. wrote that on one occasion Krirat brought Kr. H., B. P. and E. W. into his room, telling them he wanted to get them drunk and take advantage of them. On numerous occasions, he "felt on all of [them] together," but he did not really focus on her until June or July 2003 when Kr. H. and Ka. H. were out of town. Krirat told E. W. that he needed her because Kr. H. was not there. B. P. and E. W. spent the night with Krirat. He gave the girls beer and they began to get drunk. That night Krirat had sex with E. W. She later called Krirat to tell him that Ka. H.'s mother had called the police. He got upset and said, "I guess I'm going to jail."

In Kr. H.'s initial statement, she denied having sex with Krirat, but stated that she "was with" Krirat's son, who had been her boyfriend. Krirat served her alcohol and in December 2002, he began kissing her. She wrote that he had touched her breasts and her buttocks. Kr. H. stated that she had slept in Krirat's bed, and that he had told her he wanted to marry her.

Shortly thereafter, Kr. H., B. P. and E. W. were interviewed at a child advocacy center, and the videotapes of those interviews were

played for the jury.[1] B. P. told the interviewer that Krirat had forced her to do something. She said that he had given her alcohol, including a coconut drink and she did not really remember what had happened. At first E. W. told the interviewer that Krirat had touched her "everywhere," but refused to give any details. A few hours later, E. W. told the interviewer that she had decided to talk about what had happened. She said that no one had coerced her into talking; she had made up her own mind. She said that Krirat was always drunk and was always "coming on" to them, and at first they would walk away. Later, when they were watching movies in the dark, Krirat would pull E. W. toward him and feel her chest. Then in June 2003, she and B. P. went with Krirat to his bedroom, and he locked the door. E. W. had sex with Krirat, during which he placed his hand and his penis in her vagina. E. W. said that she had sex with Krirat on three separate occasions.

Kr. H. told the interviewer that Krirat had given her alcohol and touched her "butt," breasts and leg and had kissed her on the mouth and neck. She said that the touching had been on top of her clothes. She also said that she had sex with his teenage son on one occasion. On the previous Sunday, she spent the night with Krirat in his room with the door locked. This matter arose after they were discovered together in his room the next morning.

The next week, Kr. H. called Deputy Lundy to say that she had lied in her original statement and wanted to write another one. In her second statement, which Deputy Lundy also read to the jury, Kr. H. stated that she had sex with Krirat three times, including the morning they were discovered together.

The State also presented testimony from a nurse practitioner who performed forensic examinations on Kr. H., B. P. and E. W. to look for signs of sexual abuse. The nurse detected signs of sexual activity during her exams of Kr. H. and B. P., and in the case of Kr. H., recent sexual activity. Although the examination of E. W. was normal, the nurse stated this did not preclude the possibility of sexual activity.

1. Krirat first asserts that the trial court erred in applying the provisions of the rape shield statute, OCGA § 24-2-3 (a), to prohibit him from questioning Kr. H. about her sexual relationship with Krirat's teenage son. In her statement to Deputy Lundy, Kr. H. stated that she had been "with" Krirat's teenage son. Krirat sought to introduce evidence of her sexual relationship with his son. He asserts

---

[1] The parties agreed prior to trial that certain portions of the videotapes involving instances of double hearsay would be muted as the tape played for the jury. The tapes themselves were not redacted in any way. Although the muted portions were not noted on the record, in our review of the tapes, we have disregarded those portions where one of the girls repeated something that someone else told them.

that this evidence was essential to provide an alternate explanation for the results of her physical exam, which indicated recent sexual activity. Krirat states that it was error for the trial court to exclude such evidence because, under the law existing at the time of his trial, the rape shield statute applied only in rape cases.

The trial in the case occurred in November 2004. At that time, the rape shield statute had been interpreted as applying to child molestation cases. *Flowers v. State*, 255 Ga. App. 660, 661-662 (2) (566 SE2d 339) (2002), citing *McGarity v. State*, 224 Ga. App. 302, 303 (1) (480 SE2d 319) (1997). But in March 2005, the Supreme Court of Georgia held the rape shield statute, "by its plain terms," applied only to rape prosecutions, specifically disapproving the *Flowers* and *McGarity* decisions. *Abdulkadir v. State*, 279 Ga. 122, 123 (2) (610 SE2d 50) (2005). The Supreme Court stated that legislative action would be required to extend the statute beyond its plain terms. Id. at 124 (2). A short time later, the General Assembly amended the statute to make the shield provisions applicable to prosecutions for rape, aggravated sodomy, aggravated child molestation and aggravated sexual battery. Ga. L. 2005, p. 20, § 13.1. These amendments applied prospectively only to trials commencing on or after July 1, 2005. Ga. L. 2005, p. 20, § 17. Accordingly, Krirat is correct that evidence of Kr. H.'s sexual history should not have been excluded under the rape shield statute at his November 2004 trial. *Segura v. State*, 280 Ga. App. 685, 688 (634 SE2d 858) (2006).[2]

"But when error is found, the inquiry becomes whether harm occurred. And the test for determining harmless error is whether it is highly probable that the error did not contribute to the judgment." (Punctuation and footnote omitted.) *Brown v. State*, 275 Ga. App. 281, 288 (4) (620 SE2d 394) (2005). Although Krirat was not allowed to present additional evidence of a sexual relationship between Kr. H. and his son, he concedes that the fact that such a relationship occurred was placed into evidence through Kr. H.'s own statements. In her first written statement to Deputy Lundy, Kr. H. denied having sex with Krirat, but stated that she had been "with" Krirat's son, who had been her boyfriend. In her videotaped interview she said that she had sex with him. Additionally, on cross-examination, the nurse practitioner conceded that although she saw evidence of penetration in Kr. H.'s exam she could not determine who had penetrated her, and she found no presence of sperm to allow for an identification.

---

[2] We note, however, that the Supreme Court of Georgia has held, without regard to the rape shield statute, that issues of consent and chastity are not material in cases of statutory rape. *Deen v. State*, 216 Ga. 387, 388 (3) (116 SE2d 595) (1960). Accordingly, evidence of Kr. H.'s past sexual conduct would not have been admissible in connection with the statutory rape charges against Krirat. See Molnar, Ga. Criminal Law (6th ed.), Statutory Rape, § 55-2.

The necessary evidence, therefore, was placed before the jury to allow Krirat to argue that the results of Kr. H.'s physical exam were due to sexual activity with his son, not with him. Additional evidence addressing the sexual activity would have been merely cumulative. "Considering the evidence presented, and the evidence excluded, it is highly probable that the court's error in excluding the proffered evidence did not contribute to the verdict, and thus the error was harmless." *McWilliams v. State*, 280 Ga. 724, 727 (4) (632 SE2d 127) (2006). Compare *Gresham v. State*, 281 Ga. App. 116, 119-120 (635 SE2d 316) (2006) (conviction reversed where application of rape shield statute in child molestation case precluded admission of *any* evidence of child's prior sexual history).

Moreover, as the State correctly notes, the issue of penetration as reflected in the child's physical exam addressed only the charge of statutory rape, not the child molestation charge involving Kr. H., and Krirat was acquitted on all statutory rape charges. Because Krirat cannot show harm resulting from the trial court's error, we find no basis for reversal. See *Nelson v. State*, 279 Ga. App. 859, 863 (1) (b) (632 SE2d 749) (2006).

2. Krirat next argues that the trial court erred in allowing Deputy Lundy to read the statements of Kr. H., B. P. and E. W. into evidence under the child hearsay statute, OCGA § 24-3-16. He notes that Kr. H.'s initial oral and written statements to police contradicted her allegation in her later written statement that she had sex with Krirat. He also notes that E. W. also initially denied any sexual activity with Krirat and that B. P. continually struck through portions of her written statement and re-wrote them. He also takes issue with the fact that the girls made their statements with their parents in the room. Krirat asserts that in light of these factors, the trial court, at a minimum, should have held a conference outside the presence of the jury to determine the reliability of the girls' statements. Krirat makes a similar argument with regard to the videotaped interviews of the children. He notes that Deputy Lundy was present at the center when the girls were interviewed, and that inconsistencies existed between the interviews with Kr. H. and E. W. and the girls' earlier statements.

A trial court has broad discretion in admitting evidence pursuant to the child hearsay statute, and this Court will uphold that decision absent an abuse of that discretion. *Newton v. State*, 281 Ga. App. 549, 552 (2) (636 SE2d 728) (2006). There is no requirement under the statute that the trial court hold a hearing to determine the reliability of such statements prior to their admission.

Moreover, the trial court need not make an express finding that the circumstances of the statement at issue provide

sufficient indicia of reliability before admitting the statement, as this statutory requirement is met if after both parties have rested, the record contains evidence which would support such a finding.

(Citations and punctuation omitted.) *Phillips v. State*, 284 Ga. App. 224, 227 (1) (a) (644 SE2d 153) (2007). Among the factors a trial court may consider in determining the admissibility of evidence under the child hearsay statute are the following:

(1) the atmosphere and circumstances under which the statement *was made* (including the time, the place, and the people present thereat); (2) the spontaneity of the child's statement to the persons present; (3) the child's age; (4) the child's general demeanor; (5) the child's condition (physical or emotional); (6) the presence or absence of threats or promise of benefits; (7) the presence or absence of drugs or alcohol; (8) the child's general credibility; (9) the presence or absence of any coaching by parents or other third parties before or at the time of the child's statement, and type of coaching and circumstances surrounding the same; and, the nature of the child's statement and type of language used therein; and (10) the consistency between repeated out-of-court statements by the child.

(Citations omitted; emphasis in original.) *Gregg v. State*, 201 Ga. App. 238, 240-241 (3) (b) (411 SE2d 65) (1991). These factors are not to be applied "in mechanical [ ]or mathematical fashion, but in that manner best calculated to facilitate determination of the existence or absence of the requisite degree of trustworthiness." Id. at 241 (3) (b).

Although the trial court here did not hold an evidentiary hearing on the issue, both parties argued the matter prior to trial. And during the trial, the trial court specifically found sufficient indicia of reliability to allow for the admissibility of the videotapes, noting specifically that the location, the fact that only the interviewer was in the room, and the circumstances under which the statements were made all enhanced the reliability of the statements. The court noted further that the children's behavior was appropriate to the circumstances and there was no suggestion of coaching, threats or promises. With regard to the written statements, the trial court found that the children were all under the age of 14 at the time the statements were given, that they were available to testify and that there were sufficient indicia of reliability to allow for their admission.

We find no abuse of discretion. While all the girls and their parents were present when the girls wrote out their statements for

Deputy Lundy, the record reflects no evidence of undue pressure or influence. The deputy stated that she asked the girls general questions about school "just to break the ice." She told them that she had a report from a deputy who had met with Kr. H.'s mother and explained that she would be conducting an investigation of the matter. She told the girls that Krirat would be interviewed and that she would arrange for the girls to be interviewed at another location by someone else. Deputy Lundy then asked the girls, in turn, about their relationship with Krirat. Because their stories were all different, she asked them each to write a detailed statement of their relationship with Krirat from the time they met him, including details about any sexual encounters. The girls did not talk among themselves or with their parents while they wrote their individual statements. The deputy asked E. W. to re-write her statement because it was too vague, stating only that she had met Krirat and been to his house. She directed E. W. to provide more details, including when and where she met him, how many times she had been to his house and what activities occurred while she was at his house. And while B. P. scratched through parts of her statement and re-wrote them, Deputy Lundy said that was done by the girl on her own initiative without any prompting.

While the better practice may have been to conduct such interviews separately or outside the presence of the parents, reversal is not mandated. "[E]ven if all factors do not indicate reliability, the trial court does not necessarily abuse its discretion in admitting the statement." *Woolums v. State*, 247 Ga. App. 306, 307 (1) (540 SE2d 655) (2000). We find no abuse of discretion in this case.

Moreover, although Deputy Lundy was in the building when the girls later submitted to the videotaped interviews, she was not directly involved in the interviews. She sat in a separate room observing the interview where the girls could not see or hear her, although she was able to provide the interviewer with questions she would like her to ask. And while E. W. was at first reluctant to talk to the interviewer, she later chose to speak with her and indicated that it was her own choice, without any prompting. While certain inconsistencies existed in some of the girls' statements, all of these matters were placed into evidence. Had Krirat chosen, he could have cross-examined the girls about any of the issues he now raises with regard to their statements. See *Pickle v. State*, 280 Ga. App. 821, 833 (2) (635 SE2d 197) (2006). The trial judge told him that he would have informed the jury that the girls were being called as the court's witnesses if he wished to cross-examine them. We find no ground for reversal under these circumstances.

3. Krirat also argues that the trial court erred in denying his motion for a continuance on the ground that his mother, whom he

wished to call as a witness, was in Thailand at a family funeral. Krirat proffered that his mother would testify that she was present when the girls were allowed to come to Krirat's at "all hours of the night." She would testify about an incident in which she saw them spend the night in a tent in the front yard, but never saw any inappropriate touching by her son.

The trial court denied the continuance noting that the case had been continued on a prior occasion because a witness was in Thailand and finding that the mother did not appear to be a critical witness in the case. Other witnesses were scheduled to testify that they had been present with Krirat and the girls and observed no improper contact. Krirat, in fact, produced three other witnesses — two friends who lived with him during the period at issue and a friend who was at Krirat's house on Thanksgiving weekend in November 2002 — each of whom testified that they never observed Krirat serve the girls alcohol and never observed any improper behavior between Krirat and the girls.

The decision whether to grant or deny a motion for continuance lies within the trial court's sound discretion and this Court will not interfere absent abuse of that discretion. OCGA § 17-8-22; *Hartley v. State*, 283 Ga. App. 388, 389 (1) (641 SE2d 607) (2007). Moreover, where a motion is based upon the absence of a witness, the movant must comply with the requirements of OCGA § 17-8-25:

> In all cases wherein a continuance is sought upon the ground of the absence of a witness, the movant must make a showing of the requirements set forth in OCGA § 17-8-25, i.e., the witness is absent, he has been subpoenaed, he does not reside more than 100 miles from the place of trial, his testimony is material, the absence is not with permission of the applicant, his testimony can be procured by the next term of court, the facts expected to be proved, and that application is not made for the purpose of delay. Each of the requirements set forth in OCGA § 17-8-25 must be met before an appellate court may review the exercise of the trial court's discretion in denying a motion for continuance based upon the absence of a witness.

(Citation omitted.) *Joiner v. State*, 265 Ga. App. 395, 396 (1) (593 SE2d 936) (2004). Krirat failed to comply with the statute in several respects. He failed to establish on the record that his mother was under subpoena, that she resided within 100 miles from the place of trial, that her testimony could be procured by the next term of court and, more importantly, that her testimony was material to the case, especially in light of the testimony of the other witnesses. A trial court

does not abuse its discretion in denying a continuance where the absent witness's testimony is merely cumulative of other testimony at trial. *Knox v. State*, 227 Ga. App. 447, 448 (489 SE2d 582) (1997). This enumeration is without merit.

4. Krirat further asserts that the trial court erred in denying his request to charge the jury on "mere presence." We find no error.

> Here, the trial court instructed the jury on the State's burden of proving each element of the crime beyond a reasonable doubt, the jury's burden to acquit if the State failed to meet this burden, the presumption of innocence, the jury's duty to resolve the credibility of witnesses, and the difference between direct and circumstantial evidence. The charge as a whole therefore adequately explained the principles contained in charges on mere presence.

(Citations and punctuation omitted.) *Jackson v. State*, 284 Ga. App. 619, 626 (7) (644 SE2d 491) (2007).

5. Krirat finally asserts that the evidence was insufficient to support his convictions on the four counts of child molestation given the inconsistencies in the girls' statements. We disagree. The testimony of Ka. H., and the written and videotaped statements of Kr. H., B. P. and E. W. provide sufficient evidence to establish the elements of child molestation with regard to each girl. See *Bell v. State*, 263 Ga. App. 894, 896 (2) (589 SE2d 653) (2003); OCGA § 16-6-4 (a). To the extent that any contradictions existed or issues of credibility arose, they were for the jury to resolve:

> We defer to the jury's decision on the proper weight and credibility to be given the evidence, because it is the jury's role to choose what evidence to believe and what to reject. As long as some competent evidence exists, even though contradicted, to support each fact necessary to make out the State's case, we will uphold the jury's verdict. Moreover, the testimony of a single witness is sufficient to establish a fact.

(Citation omitted.) *Clark v. State*, 282 Ga. App. 248, 250 (1) (b) (638 SE2d 397) (2006).

*Judgment affirmed. Andrews, P. J., and Ellington, J., concur.*

DECIDED JULY 6, 2007 —
RECONSIDERATION DENIED JULY 18, 2007 —

*Carl A. Veline, Jr.*, for appellant.

*Howard Z. Simms, District Attorney, Wayne G. Tillis, Assistant District Attorney*, for appellee.